1 | Tina Wolfson, SBN 174806
    *twolfson@ahdootwolfson.com*
2 | Robert Ahdoot, SBN 172098
    *rahdoot@ahdootwolfson.com*
3 | Theodore Maya, SBN 223242
    *tmaya@ahdootwolfson.com*
4 | Bradley K. King, SBN 274399
    *bking@ahdootwolfson.com*
5 | **AHDOOT & WOLFSON, PC**
    1016 Palm Ave.
6 | West Hollywood, California 90069
    Tel: 310-474-9111; Fax: 310-474-8585

*Interim Lead Class Counsel*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| *In Re* Yapstone Data Breach | Case No. 4:15-cv-04429-JSW<br><br>The Honorable Jeffrey S. White<br><br>**DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: March 10, 2017<br>Time: 9:00 A.M.<br>Place: Courtroom 5, 2nd Floor<br>1301 Clay Street, Oakland CA 94612 |

I, Tina Wolfson, declare as follows:

1. I am an attorney licensed to practice in all courts in the State of California, and a founding member of the law firm of Ahdoot & Wolfson, PC ("AW"). I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement in this action. The matters stated herein are true of my own knowledge or, where indicated, I am informed and believe that they are true. If called upon as a witness, I could and would competently testify as follows.

2. A true and correct copy of my CV is attached hereto as **Exhibit A**, which demonstrates that AW and I are well qualified to serve as Class Counsel in this action.

## BACKGROUND AND WORK PERFORMED BY AW

3. On September 25, 2015, AW filed a putative class action lawsuit on behalf of Jonathan Koles and others similarly situated, against Yapstone Holdings, Inc., in the United States District Court for the Northern District of California, Case No. 3:15-cv-04429 ("*Koles*"), asserting causes of action for alleged violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 *et seq.*, New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* (the 'NJCFA"); New Jersey's Data Breach Act, N.J.S.A. 56:8-163, *et seq.* (the "NJDBA"), and the California Data Breach Law, Cal. Civ. Code § 1798.80, *et seq.* (the "DBL"), as well as claims for negligence, breach of implied contract, unjust enrichment. (*Koles* Dkt. No. 1.) On November 2, 2015, Locks Law Firm, LLC and Levi & Korsinsky, LLP filed a putative class action on behalf of Christopher Bonnema and all others similarly situated, against Yapstone Holdings, Inc., in the United States District Court for the Northern District of California, Case No. 4:15-cv-05023 ("*Bonnema*"), alleging claims for negligence, unjust enrichment, breach of implied contract, and violations of the California Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.* ("UCL"), and the California Data Breach Law, California Civil Code §§ 1798.80, *et seq.* ("DBL") (*Bonnema* Dkt. No. 1.)

4. On November 24, 2015, this Court granted an administrative motion to relate the two actions. (*Koles* Dkt. No. 25; *Bonnema* Dkt. No. 12.)

5. On December 29, 2015, AW, Locks Law Firm, LLC, and Levi & Korsinsky, LLP filed a joint motion to consolidate the *Koles* and *Bonnema* actions, and to appoint AW as Interim Lead Class Counsel and AW, Locks Law Firm, LLC, and Levi & Korsinsky, LLP to the Plaintiffs' Executive

– 1 –

Committee. (*Koles* Dkt. No. 29; *Bonnema* Dkt. No. 28.) The Court granted the joint motion on February 8, 2016. (*Koles* Dkt. No. 38; *Bonnema* Dkt. No. 37.)

6. In preparing the joint motion to consolidate the two actions, Plaintiffs' Counsel cooperated in organizing a leadership structure to effectively and efficiently prosecute the claims on behalf of Plaintiffs and the proposed Class.

7. On March 8, 2016, Plaintiffs Koles and Bonnema filed the Master Consolidated Class Action Complaint, captioned *In Re Yapstone Data Breach* (Dkt. No. 40) (hereinafter the "Consolidated Complaint"). The Consolidated Complaint asserted claims for negligence, breach of implied contract, unjust enrichment, and violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 *et seq*., the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*. (the 'NJCFA"); the New Jersey Data Breach Act, N.J.S.A. 56:8-163, *et seq*. (the "NJDBA"), and the California Data Breach Law, Cal. Civ. Code § 1798.80, *et seq*. (the "DBL").

8. Defendant file a Motion to Dismiss Plaintiffs' Consolidated Complaint on April 8, 2016 (Dkt. No. 42.)

9. In response, on June 7, 2016, Plaintiffs filed a First Amended Consolidated Class Action Complaint (Dkt. No. 52) ("FACC"). The Amended Complaint added three new putative class representatives, Daniel Adams, James Mitchell, and Robert McGuire, and alleged claims for negligence, breach of implied contract, unjust enrichment, and violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL"); the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*. (the "NJCFA"); the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0915, *et seq*. (the "NDTPA"); the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq*. (the "MCFA"); the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. (the "MUDTPA"); the New Jersey Data Breach Act, N.J.S.A. 56:8-163, *et seq*. (the "NJDBA"); the California Data Breach Law, Cal. Civ. Code § 1798.80, *et seq*. (the "DBL"); the Nevada Data Breach Act, N.R.S. 603A.010, *et seq*. (the "NDBA"); and the Minnesota Data Breach Act, Minn. Stat. § 325E.61, *et seq*. (the "MDBA"). The FACC alleges, *inter alia*, that that Yapstone failed to safeguard the personally identifiable information ("PII"), including customer names, e-mail addresses, physical addresses, dates of birth, social security numbers ("SSNs"), and bank account information ("BAI") that

– 2 –

DECLARATION OF TINA WOLFSON IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT (NO. 4:15-CV-04429-JSW)

Yapstone collected and maintained, and that Yapstone failed to provide timely and adequate notice to Plaintiffs and other Class members that their information had been compromised. (FACC ¶ 1).

10. Yapstone filed another Motion to Dismiss and a Motion to Strike Plaintiffs' Amended Complaint on June 24, 2016. (Dkt. Nos. 53 and 54, respectively.)

11. Before initiating these actions, AW investigated the underlying facts and analyzed the veracity of the claims. AW's research included consultations with experts, interviews of putative class members, review of informal discovery, as well as extensive factual and legal research regarding the sufficiency of the claims and the appropriateness of class certification. Furthermore, AW researched and analyzed the merits of the potential causes of action pursuant to state statutory and common law.

12. AW continued these efforts after filing *Koles* and before entering into the Stipulation of Settlement, and conducted a thorough examination, investigation, and evaluation of the relevant law and facts to assess the merits of the claims and defenses.

13. The parties began settlement discussions well over seven months ago, which resulted in the long series of arm's length negotiations, including a full day of mediation and numerous post-mediation telephonic meetings between counsel and with the mediator.

14. On or about May 17, 2016, I attended an in-person mediation session with the Honorable Richard Kramer (Ret.) of JAMS.

15. I am informed and believe that Judge Kramer is a highly respected and experienced class action mediator, who had joined JAMS following more than eighteen years on the bench, spending the most recent thirteen years as a judge with the San Francisco County Superior Court's Complex Litigation Department.

16. On or about July 7, 2015, the Parties filed a Stipulation and Proposed Order updating the Court on the settlement discussions and requesting extension of the briefing deadlines on Defendant's Motions to Dismiss and Strike. (Dkt. No. 55.)

17. The parties reached a settlement in principle on or about July 15, 2016.

18. In connection with the mediation, Plaintiffs requested substantial information from Defendant, and, to ensure that this information could be provided, the Parties filed a Notice of

Settlement and Stipulation For Order lifting the pending deadlines in relation to Defendant's Motions to Dismiss and Strike, which the Court granted on July 18, 2016. (Dkt. Nos. 57 and 58, respectively.)

19. After reaching a settlement in principle, the parties commenced memorializing the full Settlement, which generated numerous additional rounds of comprehensive and often spirited negotiations. The parties extensively negotiated each specific aspect of the Stipulation, including each of its eight (8) exhibits. For example, counsel negotiated and meticulously refined the final Notice program and each document comprising the Notice (the Long Form Notice, Summary Notice), with the assistance of a class action notice expert, to ensure that the information disseminated to Settlement Class Members is clear and concise.

20. Before entering into the concurrently filed Stipulation of Settlement, Plaintiffs, by and through their respective counsel, conducted a thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of liability, potential remedies, and all defenses thereto.

21. Plaintiffs, through their counsel, conducted an extensive investigation into the facts and law relating to the matters alleged in their respective Complaints. Plaintiffs requested information relevant to their allegations and Defendant's anticipated defenses. Defendant provided computer records purporting to show the type of PII potentially exposed for Plaintiffs Koles and Bonnema, information on the size and nature of the class of consumers affected by the Incident,[1] a forensics investigation report of Defendant's system logs after the Incident, and confirmatory discovery stating the manner in which the data Incident occurred and the scope of the Incident. Plaintiffs' Counsel thoroughly analyzed and evaluated all provided information, including documents bearing on: (i) the extent, nature, and quality of Defendants' cyber security during the Class Period; (ii) Defendants' representations and disclosures regarding the data Incident; and (iii) the size and composition of the Class. This investigation also included consultations with experts, numerous interviews of putative

---

[1] For ease of reference, the "Incident" is defined in the Settlement as: In September of 2015, Yapstone announced it experienced a data incident in which certain personally identifiable information ("PII") of some users may have been exposed via unsecured online unique resource locators ("URLs"), otherwise commonly known as "web addresses," between July 15, 2014 and August 5, 2015. (Stip. Recital ¶ B.)

– 4 –

Settlement Class Members, and extensive factual and legal research as to the sufficiency of the claims and appropriateness of class certification.

22. The concurrently filed Stipulation of Settlement was reached as a result of extensive arms-length negotiations between the Parties and their counsel, occurring over the course of a number of months and with a full day of in-person mediation sessions with a respected mediator, the Honorable Richard Kramer (Ret.) of JAMS. Following the in-person mediation, the Parties continued to engage in extensive settlement discussion through the mediator, and amongst each other, until a settlement in principle was reached. This arms-length exchange provided Plaintiffs and their counsel with sufficient information to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

**SUMMARY OF INFORMATION RECEIVED FROM DEFENDANTS**

23. As part of the investigation described above, Plaintiffs requested information from Defendant, and discovery revealed the following:

24. Yapstone is purportedly an online "payments service provider (PSP)" company located in Walnut Creek, California, which provides payment services for e-commerce websites that have a large volume of regular payment processing needs, such as third party Homeaway.com, Inc. (a.k.a. VRBO.com.

25. In September of 2015, Yapstone announced it experienced a data Incident in which certain personally identifiable information ("PII") of some users may have been exposed via unsecured online unique resource locators ("URLs"), otherwise commonly known as "web addresses," between July 15, 2014 and August 5, 2015 (the "Incident"). The PII had been provided by real estate lessor users ("Lessors"), on standardized Yapstone payment processing application forms, who sought to use Yapstone's service for collection of real estate rental payments intended for the Lessors. The forms were used to provide Yapstone with information on which to decide whether to accept such payments and identity verification only, and not for withdrawals or charges against lessees or those making the payments. Hence, the forms did not request credit card or debit card information.

26. The PII provided varied, but mostly included the name, address, date of birth, and bank deposit routing numbers and account numbers ("bank account information"). A minority of these users

– 5 –
DECLARATION OF TINA WOLFSON IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT (NO. 4:15-CV-04429-JSW)

(approximately 36,500) had also provided their social security number ("SSN"), driver's license numbers ("DLN"), and/or passport numbers ("PN"). There were no credit card numbers, bank PINs, or account credentials.

27. Yapstone hired outside third party experts to investigate the Incident. Yapstone contends that they did not find any evidence of malicious extraction of user PII and confirmed that against the access logs.

28. Yapstone contends that (i) no PII was extracted or misused and (ii) it nevertheless thought it important for its reputation and goodwill as a payments processor and vendor to notify users of the Incident by sending the Incident Notices, after September 2015 (the time during which Yapstone sent the Incident Notices is hereinafter referred to as the "Incident Notification Period"). Yapstone also contends that included in Yapstone's Incident Notices was an offer for two years of credit protection services through Experian's ProtectMyID®, free of charge (hereinafter the "Monitoring Offer"). In addition to credit monitoring and protection services, Yapstone contends that the ProtectMyID® Services provided enrolled individuals with up to $1 million in identity theft insurance, surveillance reports, and identity theft resolution. Yapstone contends that it kept the Monitoring Offer open for approximately four months, and provided extensions of two to four additional months.

29. According to Yapstone, it sent approximately 182,500 Incident Notices to its users, and the information that may have been exposed mostly included a user's name, address, date of birth, and bank deposit routing numbers and account numbers.

30. Yapstone contends that approximately 30,342 of the Settlement Class Members also qualify as Redemption Claimants.

31. Yapstone is in possession of the names, e-mail addresses, and physical mailing addresses of all Settlement Class Members.

**CALCULATION OF REDEMPTION CLASS MEMBERS' CONSIDERATION**

32. Each of the approximately 30,342 Redemption Claimants will be eligible to make a claim for a full year's worth of Experian's ProtectMyID® identity theft and monitoring service, at Yapstone's expense. This service includes a free credit report, for which Experian typically charges $14.95. (Siciliano Decl. ¶ 9.) The service also includes surveillance alerts for daily bureau credit monitoring

(alerts of key changes and suspicious activity found on the claimant's Experian credit report), identity theft resolution and ProtectMyID® ExtendCARE™ (toll-free access to US-based customer care and a dedicated identity theft resolution agent who will walk the claimant through the process of fraud resolution from start to finish for seamless service; they will investigate each incident; help with contacting credit grantors to dispute charges and close accounts including credit, debit and medical insurance cards; assist with freezing credit files; contact government agencies), and $1 million identity theft insurance (immediately covers certain costs including lost wages, private investigator fees, and unauthorized electronic fund transfers). (Siciliano Decl. ¶ 5.) The whole package that each Redemption Claimant is eligible to receive has a first-year retail value of $159.95. (*Id.* ¶ 15.) Furthermore, because ExtendCARE™ is included with the ProtectMyID® service and provides claimants with the same high-level of fraud resolution support even after their ProtectMyID® memberships expire, this Settlement is making available to each Redemption Claimant an estimated retail value of $145 per year, in perpetuity, after the first year. (*Id.* ¶ 16.) ExtendCARE™ does not expire for claimants who enroll. (*Id.* ¶ 6.)

33. Based on approximately 30,342 Redemption Claimants, the projected total retail value that this Settlement makes available in the first year is $4,853,202.90, and then $4,399,590 annually thereafter for the lives of the Redemption Claimants. (*Id.* ¶ 19.)

34. All of the approximately 182,500 Settlement Class Members, even those who did not have their SSN, DLN, or PN potentially exposed in the Incident, had the opportunity to claim this same ProtectMyID® Service after September 2015 when Yapstone sent the Incident Notices.

35. Separate and apart from the ProtectMyID® services, Yapstone will pay $120,000, equally, to two non-profit organizations, which will be paid on behalf of all Settlement Class Members. The two organizations are Public Justice and the UC Berkeley School of Information, Center For Long-Term Cybersecurity.

36. In my view, the Settlement provides substantial benefits to the Class, especially when one considers the attendant expense, risks, delays, and uncertainties of litigation, trial and post-trial proceedings.

## COUNSEL'S ANALYSIS OF MAXIMUM POSSIBLE RECOVERY

37. Plaintiffs estimate the maximum potential recovery for their claims arising from Defendant's data Incident at $1,095,000, based on the calculations and information described below. In estimating the maximum potential recovery for these claims, Plaintiffs recognize that they and the Class will encounter difficulty proving that any injury allegedly relating to the data Incident is attributable to Defendant's conduct or failures. Plaintiffs also recognize that Defendant would argue proposed Class would encompass uninjured persons, or persons lacking Article III standing. Defendants would also likely contend that the types of PII that were involved in the incident for each affected individual varies depending on when the user first applied for direct deposit of payments through Yapstone, and that not all individuals had their SSN, DLN, and/or PN potentially exposed, posing barriers to certification. Furthermore, the injuries suffered by Plaintiffs and the Class were relatively small if not nominal, as most, if not all, of the consumers who suffered fraud in the wake of the incident have been fully reimbursed by their financial institutions. As such, the maximum potential recovery for Plaintiffs' claims arising from Defendant's data Incident include a calculation of any out-of-pocket expenditures incurred by consumers in attempting to remediate the fraud or protect against future identity theft and fraud, and nominal damages for time spent remediating the fraud and for invasion of privacy. For these nominal damages, Class Counsel's best estimate (under the facts of this case) of the Settlement Class's maximum potential recovery is $5.00 per Member whose SSN, DLN, and/or PN was not involved, and $10.00 per Member whose SSN, DLN, and/or PN was potentially exposed, as those identifiers are highly sensitive and valuable to identity thieves.

38. Based on the information provided by Defendant and described above, Plaintiffs understand that approximately 36,500 consumers had their SSN, DLN, and/or PN potentially exposed in the Incident. Therefore, if each consumer whose SSN, DLN, and/or PN was potentially exposed received nominal damages of $10.00, the maximum potential recovery for those class members is $365,000. Approximately 6,017 of the consumers whose SSN, DLN, and/or PN was potentially exposed already enrolled in ProtectMyID® Services offered by Yapstone in the Incident Notices. Therefore, approximately 30,342 consumers remain as Redemption Claimants pursuant to this Settlement. The $159.95 first year retail value of the ProtectMyID® Services made available to Redemption Claimants

– 8 –

by this Settlement—or $4,853,202.90 in the aggregate—amounts to significantly higher than 100% of the estimated maximum potential recovery for these consumers. Even if a mere five percent (5%) of Redemption Claimants enroll in ProtectMyID® under the Settlement, the value of those identity monitoring services to those claimants is an estimated $242,660.15[2] in the first year alone.

39. Based on the information provided by Defendant and described above, Plaintiffs understand that approximately 146,000 consumers did not have their SSN, DLN, and/or PN involved in the Incident. If each of these consumers was entitled to nominal damages of $5.00, the total maximum potential recovery for all of those class members would equal $730,000. These consumers are Settlement Class Members who, although ineligible for ProtectMyID®, will benefit from the injunctive relief and the $120,000 cash Settlement Fund. Though difficult to quantify the value of the injunctive relief, as discussed above, the benefit is substantial. Considering the Settlement Fund alone, the Settlement Class Members who are not Redemption Claimants will be receiving a benefit that is over 16% of the maximum potential recovery to these consumers.

40. Based AW's investigation, research, document and information review, interviews, as well as my personal knowledge and experience, I believe that the Settlement is in the best interests of the Class and that the Settlement is fair, reasonable, and adequate. The benefits afforded by the Settlement reflect a reasoned compromise which not only takes into consideration the risks inherent in all complex, class litigation, but also the various issues in this case specifically, which had the potential to completely eliminate recovery available to the Class.

41. While I believe that the claims asserted in this action have merit and that the evidence developed to date supports those claims, I also recognize and acknowledge, based on my experience, the expense and length of time necessary to prosecute this case to judgment. I have also have taken into account the uncertain outcome and the risk of any litigation, as well as the difficulties and delays inherent in such litigation. I am also mindful of the inherent problems of proof in establishing the claims asserted in this action, and rebutting Defendant's possible defenses to those claims.

---

[2] If only 5% of the estimated 30,342 Redemption Claimants now enroll pursuant to this Settlement, at $159.95 per consumer, the total value to those Redemption Claimants is approximately $242,660.15 in the first year.

– 9 –

I declare under penalty of perjury under the laws of California and of the United States that the foregoing is true and correct. Executed this 20th day of January, 2017 in West Hollywood, California.

        /s/ Tina Wolfson
        Tina Wolfson

# EXHIBIT A

TO DECLARATION OF TINA WOLFSON IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:15-cv-04429-JSW



# AHDOOT & WOLFSON, PC
ATTORNEYS

In March 1998, Tina Wolfson and Robert Ahdoot founded Ahdoot & Wolfson, PC ("AW"). AW is a top tier law firm specializing in advocating consumer and employee rights. The attorneys at AW vigorously litigate against large corporations to vindicate the rights of millions of consumers or employees in protracted, complex litigation, to successful results.

AW has been appointed class counsel in numerous class actions, and, as founding members, Ms. Wolfson and Mr. Ahdoot have obtained extensive experience in prosecuting complex class action and representative lawsuits. They have served as plaintiffs' counsel/co-counsel or class counsel and litigated numerous class actions or representative actions against large corporate defendants involving varied consumer rights claims.

Ms. Wolfson attended and graduated Harvard Law School *cum laude* in 1994. Ms. Wolfson began her civil litigation career at the Los Angeles office of Morrison & Foerster, LLP, where she defended major corporations in complex actions and represented indigent individuals in immigration and deportation trials as part of the firm's *pro bono* practice. She then gained further invaluable litigation and trial experience at a boutique firm, focusing on representing plaintiffs on a contingency basis in civil rights and employee rights cases.

Mr. Ahdoot graduated from Pepperdine Law School *cum laude* in 1994 where he served as literary editor of the Pepperdine Law Review. He clerked for the Honorable Paul Flynn at the California Court of Appeals, and then began his career as a civil litigator at the Los Angeles office of Mendes & Mount, LLP, where he defended large corporations and syndicates such as Lloyds of London in complex environmental and construction-related litigation as well as a variety of other matters.

Ms. Wolfson is currently serving, by court appointment, as Co-Lead Counsel in the MDL action entitled *In re: Experian Data Breach Litigation*, Case No. 8:15-cv-01592-AG-DFM (C.D. Cal.) (Judge Guilford presiding). She also is serving, by court appointment, as Co-Lead Counsel in the MDL action entitled *In re: Kind LLC "All Natural" Litigation*, No. 1:15-md-02645-WHP (S.D.N.Y.) (Judge Pauley presiding). She also is serving, by court appointment, as Co-Lead Counsel in the MDL action entitled *In re: Whole Foods Market,*

*Inc., Greek Yogurt Marketing and Sales Practices Litigation*, Case No. 1:14-mc-02588-SS (W.D. Tex.) (Judge Sparks presiding). AW is serving as Class Counsel in the coordinated actions entitled *Williamson v. McAfee*, Case No. 5:14-cv-00158-EJD (N.D. Cal.) and *Kirby v. McAfee*, Case No. 5:14-cv-02475-EJD (Judge Davila presiding) (final approval pending).

Ms. Wolfson also is currently serving, by court appointment, on the Consumer Plaintiffs' Steering Committee in the MDL action entitled *In re: The Home Depot, Inc., Customer Data Security Breach Litigation*, Case No. 1:14-md-02583-TWT (N.D. Ga.) (Judge Thrash presiding). She is also serving, by court appointment, on the Plaintiffs' Executive Leadership Committee in the current MDL action entitled *In re: Premera Blue Cross Customer Data Security Breach Litigation*, Case No. 3:15-md-02633-SI (D. Or.) (Judge Simon presiding). She is also serving, by court appointment, on the Plaintiffs' Steering Committee in the current MDL action entitled *In re: U.S. Office of Personnel Management Data Security Breach Litigation*, Case No. 1:15-cv-01394-ABJ (D.D.C.) (Judge Jackson presiding).

AW has been appointed lead counsel in numerous other complex consumer class actions, sometimes in contested leadership applications. The following examples of such actions are either ongoing or have been successfully resolved, and have or will confer millions of dollars worth of benefits to the class, as well as injunctive relief:

- *Pappas v. Naked Juice Co. of Glendora, Inc.*, Case No. 2:11-cv-8276-JAK-PLA (C.D. Cal.) (appointed co-lead counsel after contested application; resulted in the second largest food false advertising case ever ($9,000,000 non-revertible fund)).
- *Trammell v. Barbara's Bakery, Inc.*, Case No. 3:12-cv-02664-CRB (N.D. Cal.) (nationwide settlement of food false advertising case, non-revertible fund; when preliminarily approving the settlement, Judge Breyer commented that the settlement is an "excellent settlement" and that both sides did "an excellent job of resolving the case," doing a "superb job" and presenting "a model of good lawyering on both sides"; when granting final approval to the settlement, Judge Breyer reiterated that the settlement was "very good" and that the case was "quite a successful class action").
- *Cassidy v. Reebok International Ltd.*, Case No. 2:10-cv-09966-AHM (C.D. Cal.) (nationwide settlement of apparel false advertising case; non-revertible fund).
- *Carey v. New Balance Athletic Shoe, Inc.*, Case Nos. 1:11-cv-10632-LTS & 1:11-cv-10001-LTS (D. Mass.) (nationwide settlement of apparel false advertising case; non-revertible fund).
- *West v. Examsoft Worldwide Inc.*, Case No. 14-cv-22950-UU (S.D. Fla.)

(nationwide settlement preliminarily approved arising from software error on bar exam).
- *Chimeno-Buzzi v. Hollister Co.*, Case No. 1:14-cv-23120-MGC (S.D. Fla.) (nationwide settlement arising from automated text messages alleged to violate the Telephone Consumer Protection Act).
- *Skeen v. BMW of North America, LLC*, Case No. 2:13-cv-01531-WHW-CLW (D.N.J.) (nationwide settlement arising from alleged timing chain tensioner defect in MINI vehicles).
- *Mirto v. AIG/Granite State Insurance Co. et al.*, Case No. HG 04180408 (Cal. Super. Ct., Alameda Cty.).
- *Axen v. Ginco International, et al.*, Case No. 427033 (SFSC).
- *Citizens for Responsible Business v. Rite Aid Corporation, et al.*, Case No. 414831 (SFSC) (prosecuted claims of false and illegal labeling in the herbal supplement industry against 107 retailers and manufacturers, who were gleaning millions of dollars from this nationwide practice; AW was successful in completely eradicating the alleged illegal practice in the United States).
- *In Re: Hain Celestial Seasonings Products Consumer Litig.*, Case No. 13-cv-01757-AG-AN (C.D. Cal.) (appointed co-lead counsel after contested application; class certification motion pending).
- *Lavinsky vs. City of Los Angeles*, Case No. BC542245 (LASC) (challenging allegedly illegal utilities taxation practices).
- *Feliciano v. General Motors LLC*, Case No. 14-cv-06374-AT (S.D.N.Y.) (product defect regarding Chevy Cruze vehicles).
- *Weiss v. Los Angeles*, No. BC 141354 (LASC) (challenging the defendant's review of parking violations, won *writ of mandate* to stop the allegedly illegal practice).
- *In re: SFPP Right-of-Way Claims*, No. 8:15-cv-00718-JVS-DFM (C.D. Cal.).
- *In re: Daily Fantasy Sports Litig.*, Case No. 1:16-md-02677-GAO (D. Mass.).
- *Moody v. Ocwen Loan Servicing, LLC*, Case No. 2:15-cv-05186-DMG-GJS (C.D. Cal.).
- *DiFrancesco v. UTZ Quality Foods, Inc.*, Case No. 1:14-cv-14744-DPW (D. Mass.).
- *Philliben, et al. v. Uber Technologies, Inc.*, Case No. 3:14-cv-05615-JST (N.D. Cal.).
- *Ellinghaus v. Educational Testing Service*, No. 2:15-cv-03442-SJF-AKT (E.D.N.Y.).
- *Tucker v. Wal-Mart Stores, Inc.*, Case No. 15SL-CC02693-BWW (Mo. Cir. Ct., 21st Cir., St. Louis Cty.).
- *A.Y. v. The Regents of the University of California*, Case No. BC590344 (Cal. Super.

Ct., Los Angeles Cty. ("LASC")).

- *Bishop v. Shorter University, Inc.*, Case No. 4:15-cv-00033-HLM (N.D. Ga.).
- *In re: Uber FCRA Litigation*, Case No. 3:14-cv-05200-EMC (N.D. Cal.) (challenging the defendant's alleged violations of the FCRA).
- *Whalen v. Michaels Stores, Inc.*, Case No. 2:14-cv-07006-JS-ARL (E.N.D.Y.).
- *In re: Intuit Data Litigation*, Case No. 5:15-cv-01778-EJD (N.D. Cal.).
- *Wood v. American Eagle Outfitters, Inc.*, Case No. 1:15-cv-02370-VEC (S.D.N.Y.).
- *Rivera v. Google*, Case No. 1:16-cv-02714 (N.D. Ill.).
- *Haddix v. General Mills Inc.*, Case No. 2:15-cv-02625-MCE-KJN (E.D. Cal.).
- *Smith v. Floor and Decor Outlets of America, Inc.*, Case No. 1:15-cv-04316-ELR (N.D. Ga.)
- *Seim v. HomeAway, Inc.*, Case No. 1:16-cv-00479-LY (W.D. Tex.).
- *In re: The Honest Co., Inc., SLS Marketing and Sales Practices Litig.*, MDL No. 2719 (pending); underlying case *Alhadeff v. The Honest Co., Inc.*, Case No. 2:16-cv-02361-AB-RAO (C.D. Cal.).
- *Abad v. Lumber Liquidators, Inc.*, Case No. 2:15-cv-03795-MMM-JPR (C.D. Cal.).
- *Gillette v. Uber Technologies, Inc.*, Case No. 3:14-cv-05241-EMC (N.D. Cal.).

AW has been prosecuting cutting edge cases on behalf of consumer classes since the late 1990's. They were among the first group of attorneys who successfully litigated the privacy rights of millions of consumers against major financial institutions—including Chase Manhattan Bank, American Express, MBNA America Bank, Discover Bank, FleetBoston, and Washington Mutual Bank—where the plaintiffs alleged that the defendants used their personal information to compile detailed financial dossiers to use for internal marketing purposes and to sell them to third party telemarketers, without their consent. As lead counsel in these privacy class actions, AW brought the consumer claims to successful conclusion on a class-wide basis, conferring millions of dollars of benefits to consumers. The business practices that her clients challenged in these cases later became the subject of Graham Leach Bliley Act regulation.

Ms. Wolfson was elected as co-lead class counsel in the consumer class action stemming out of the Neiman Marcus data breach, entitled *Remijas, et al. v. Neiman Marcus Group, LLC*, Case No. 14-cv-1735 (N.D. Ill.). AW, with Ms. Wolfson at the helm, was responsible for briefing and arguing the groundbreaking appeal from the trial court's order granting the Motion to Dismiss on the pleadings based on lack of Article III standing. The Seventh Circuit's landmark opinion was the first appellate decision issued after the Supreme Court's decision in *Clapper v. Amnesty Intern. USA*, 133 S.Ct. 1138 (2013). The

defense bar has aggressively advocated that *Clapper* set a more rigorous standard for Article III standing inquiries and required a finding of no standing on behalf of plaintiffs in a data breach case, unless plaintiffs were able to show that they suffered unreimbursed fraudulent charges. The *Neiman Marcus* opinion was the first appellate court to reject this view of *Clapper* and, adopting the plaintiff's reasoning, established, among other things, that data breach victims have standing to pursue claims based on the increased risk of identity theft and fraud, even before that theft or fraud materializes. *Remijas v. Neiman Marcus*, Case No. 14-3122 (7th Cir. July 20, 2015) (reversed and remanded).

AW also was instrumental to the consumer plaintiffs' efforts in the Target data breach litigation. *In re: Target Corporation Customer Data Security Breach Litigation*, Case No. 14-md-2522 (D. Minn.) AW contributed considerable effort to vetting hundreds of potential class representatives, legal research involving the different state laws in play, the consolidated complaint, and significant discovery efforts. AW has also prosecuted medical privacy class actions on behalf of victims of data breaches under the California Confidentiality of Medical Information Act (CMIA). For example, AW was a member of the Executive Committee in the consolidated actions entitled *Whitaker v. Health Net*, Case No. 2:11-cv-00910-KJM (E.D. Cal.), and in the *Sutter Medical Information Cases*, Case No. JCCP 4698 (Cal. Super. Ct., Sacramento Cty.).

Ms. Wolfson serves as a co-chair of the Federal Torts Section of the Federal Bar Association. She co-authored, along with AW associate Bradley King, an article discussing developments in enforcement of arbitration agreements. Tina Wolfson & Bradley King, *Even After* Concepcion *and* Italian Colors, *Some Arbitration Agreements Are Not Enforceable*, FED. LAWYER, Jan./Feb. 2015, Vol. 62 Issue 1, p 19. Ms. Wolfson is also an active member of the California Bar Privacy Law Subcommittee.

Additionally, Ms. Wolfson frequently lectures on numerous topics related to class action litigation across the country. An incomplete list of her speaking engagements is as follows:

- American Association for Justice: AAJ 2015 Annual Convention, July 2015, Montreal: "The Mechanics of Class Action Certification."
- HarrisMartin: Data Breach Litigation Conference: The Coming of Age, March 2015, San Diego: "The First Hurdles: Standing and Other Motion to Dismiss Arguments."
- Bridgeport: 2015 Annual Consumer Class Action Conference, February 2015, Miami: Co-Chair.
- Venable, LLP: October 2014, San Francisco: invited by former opposing counsel

5

to present mock oral argument on a motion to certify the class in a food labeling case, Hon. Marilyn Hall Patel (Ret.) presiding.

- Bridgeport: 15th Annual Class Action Litigation Conference, September 2014, San Francisco: "Food Labeling and Nutritional Claim Specific Class Actions" (Co-Chair and Panelist).
- Bridgeport: 2014 Consumer Class Action Conference, June 2014, Chicago: "Hot Topics in Food Class Action Litigation."
- Perrin Conferences: Challenges Facing the Food and Beverage Industries in Complex Consumer Litigations, April 2014, Chicago, where I was invited to discuss cutting edge developments in settlement negotiations, notice, and other topics.
- Bridgeport: Class Action Litigation & Management Conference, April 2014, Los Angeles: "Getting Your Settlement Approved."
- HarrisMartin: Target Data Security Breach Litigation Conference, March 2014, San Diego: "Neiman Marcus and Michael's Data Breach Cases and the Future of Data Breach Cases."
- Bridgeport: Advertising, Marketing & Media Law: Litigation and Best Management Practices, March 2014, Los Angeles: "Class Waivers and Arbitration Provisions Post-*Concepcion / Oxford Health Care.*"
- Federal Bar Association: The Future of Class Actions, featuring the Hon. Jon Tigar and the Hon. Laurel Beeler, November 2015, San Francisco: "Cutting Edge Topics in Class Action Litigation" (Co-Chair and Faculty).
- Federal Bar Association: 2016 Class Action Symposium, featuring the Hon. Joseph F. Anderson and the Hon. Susan Illston, November 2016, San Francisco (Co-Chair and Faculty).

Mr. Ahdoot also frequently lectures on numerous topics related to class action litigation across the country. An incomplete list of his speaking engagements is as follows:

- HarrisMartin: Lumber Liquidators Flooring Litigation Conference, May 2015, Minneapolis: "Best Legal Claims and Defenses."
- Bridgeport: 15th Annual Class Action Litigation Conference, September 2014, San Francisco: "The Scourge of the System: Serial Objectors."
- Strafford Webinars: Crafting Class Settlement Notice Programs: Due Process, Reach, Claims Rates and More, February 2014: "Minimizing Court Scrutiny and Overcoming Objector Challenges."
- Pincus: Wage & Hour and Consumer Class Actions for Newer Attorneys: The

6

Do's and Don'ts, January 2014, Los Angeles: "Current Uses for the 17200, the CLRA an PAGA."
- Bridgeport: 2013 Class Action Litigation & Management Conference, August 2013, San Francisco: "Settlement Mechanics and Strategy.